UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**STACEY DIANE BELL**,                                    Case No. 3:15-cv-02172-KI

               Plaintiff,                              OPINION AND ORDER

   v.

**CAROLYN W. COLVIN, Acting
Commissioner of Social Security**,

            Defendant.


      Lisa R.J. Porter
      JP Law PC
      5200 SW Meadows Rd., Ste. 150
      Lake Oswego, OR 97035

           Attorney for Plaintiff

      Billy J. Williams
      United States Attorney
      District of Oregon

Page 1 - OPINION AND ORDER

Janice E. Hebert
Assistant United States Attorney
1000 SW Third Ave., Ste. 600
Portland, OR 97204

Alexis L. Toma
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Ste. 2900 M/S 221A
Seattle, WA 98104-7075

      Attorneys for Defendant

KING, Judge:

Plaintiff Stacey Diane Bell brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying Bell's application for disability insurance benefits ("DIB"). I affirm the decision of the Commissioner.

## BACKGROUND

Bell filed an application for DIB and a period of disability on October 26, 2011, alleging disability beginning October 15, 2010. The application was denied initially and upon reconsideration. After a timely request for a hearing, Bell, represented by counsel, appeared and testified before an Administrative Law Judge ("ALJ") on June 2, 2014.

On July 17, 2014, the ALJ issued a decision finding Bell was not disabled within the meaning of the Act and therefore not entitled to benefits. This decision became the final decision of the Commissioner when the Appeals Council declined to review the decision of the ALJ on October 19, 2015.

Page 2 - OPINION AND ORDER

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b) and 416.920(b). If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one

"which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]"  20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past.  If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience.  The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities.  *Parra*, 481 F.3d at 746.  The claimant is entitled to disability benefits only if he is not able to perform other work.  20 C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards.  *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less

than a preponderance. *Id.* (internal quotation omitted). The court must uphold the ALJ's

findings if they "are supported by inferences reasonably drawn from the record[,]" even if the

evidence is susceptible to multiple rational interpretations. *Id.*

## THE ALJ'S DECISION

Bell suffers from the following severe impairments: fibromyalgia, generalized anxiety

disorder, and affective disorder. The ALJ found that these impairments, either singly or in

combination, did not meet or medically equal the requirements of any of the impairments listed

in 20 C.F.R. Part 404, Subpart P, Appendix 1. Given these impairments, the ALJ concluded Bell

retained the residual functional capacity ("RFC") to perform light work. Such work involves

carrying up to twenty pounds occasionally and ten pounds frequently, standing and/or walking up

to six hours and sitting up to six hours in an eight-hour day. She can frequently climb ramps and

stairs, and occasionally climb ladders, ropes, and scaffolds. Bell has an unlimited ability to

balance, and she can perform occasional stooping, kneeling, crouching, and crawling. She must

avoid concentrated exposure to fumes, odors, dusts, gases, and poorly ventilated areas as well as

to hazards such as moving machinery and unprotected heights. To account for any limitations in

attendance, production, and work place behavior, the ALJ limited Bell to understanding,

remembering, and carrying out unskilled and routine work.

Based on this RFC, the ALJ found Bell could not perform her past relevant work, but that

she could perform other work in the national economy such as cashier II, small products

assembler, and information clerk. As a result, she was not disabled under the Act.

## FACTS

At 32 years old on her alleged disability onset date, Bell had a high school degree, some college, and work history as a customer service representative, graphic designer, and project manager. About a year before the end of her last job, she sought care from Kai Li, M.D., for insomnia and chronic spinal pain. Dr. Li recommended a change in work hours to accommodate her need to sleep later, and urged Bell to avoid prolonged sitting for more than 30 minutes. A month later, Ronald Fraback, M.D., recommended a TNF inhibitor[1] (which Bell declined), ibuprofen, a donut for her coccyx pain, and told her she could apply for short-term disability through her work due to her ongoing musculoskeletal pain. Bell had a baby in the spring of 2010. She was placed on a performance improvement plan upon her return to work and was terminated in October 2010 for failing to "demonstrate the ownership and initiative skills necessary for success" in the position. Tr. 306.

Bell got pregnant again, with a due date in the summer of 2011. She reported to Dr. Li in May 2011 that her pain was at 6/10 and could shoot to her legs; she was taking Effexor for chronic depression and "doing relatively well." Tr. 338. Upon examination, Dr. Li noted "mild cervical and lumbar tenderness. Normal ROM of cervical spine" and normal muscle strength. Tr. 339. Dr. Li prescribed Vicodin and Effexor. When Bell returned to Dr. Li in November, she had a three-month old baby, she was depressed and fatigued. Her spine was tender on palpation. Dr. Li increased the dosage of Norco and Effexor, and encouraged her to see her rheumatologist.

---

[1] "TNF inhibitors are drugs that help stop inflammation. They're used to treat diseases like rheumatoid arthritis, juvenile arthritis, psoriatic arthritis, plaque psoriasis, ankylosing spondylitis, ulcerative colitis, and Crohn's disease." www.webmd.com/rheumatoid-arthritis/tnf-inhibitor-inflammation#1 (last visited 11/28/2016).

When Dr. Fraback saw Bell in December 2011, he described her as "healthy appearing." Tr. 355. She had limited motion with rotation in her neck, but full ROM in her shoulders, with unremarkable elbows, wrists and hands. She reported pain throughout her spine, but demonstrated tenderness in the buttock area only. Dr. Fraback recommended a TNF inhibitor, and told her that "ankylosing spondylitis [('AS')] in women tended to be a milder condition in terms of physical or x-ray findings." Tr. 356. He suggested increasing ibuprofen and asked her to return in a year.

Bell did not return to Dr. Li (other than for cold symptoms) for six months. At a May 2012 appointment, Dr. Li diagnosed IBS, chronic pain, depression, and anxiety disorder NOS. Bell reported using medical marijuana as well as narcotics for pain. Bell displayed spinal tenderness on palpation, but normal strength. Two months later, Bell continued to report IBS symptoms, chronic neck and lower back pain, and anxiety and depression. Her husband had been diagnosed with bipolar disorder. Her cervical and lumbar spine was tender, and she demonstrated diminished ROM. Dr. Li prescribed Norco and referred her to Western Psychological and Counseling Services.

At her intake appointment with Western Psychological and Counseling Services, Bell described depression, anxiety, and difficulty getting projects completed. She said she had a home business with her spouse. Tr. 440, 436. She spent her first appointment with counselor Theresa Graham, LPL, discussing her marital conflicts, her excessive worry, and her fatigue. At her initial medication evaluation, Bell reported her current stressors included her husband's diagnosis, parenting three young children, and financial issues. She said she was working as a Scentsy representative, and in marketing. Tr. 402. She described symptoms of OCD, ADHD,

and depression.  Danell Bjornson, PMHNP-BC, prescribed Wellbutrin, Clonazepam, and referred Bell for a sleep study.

When she returned to Bjornson in October, Bell reported increased anger; she was smiling inappropriately.  Bjornson stopped the Wellbutrin, added Buspar, and directed that Bell take Clonazepam at night only.

Dr. Li referred Bell to Andre Barkhuizen, M.D., for an assessment of her AS.  Dr. Barkhuizen described Bell as alert, oriented, and very pleasant.  She had tender "PIPs and MCPs" but no swelling, normal fists, no elbow flexion deformities, full ROM of her shoulders, hips, knees and ankles.  Bell reported low back pain with forward flexion, but she had normal rotation and lateral flexion of her thoracolumbar and cervical spine.  The doctor noted 18 of 18 fibromyalgia tender points.  The doctor authorized continued use of medical marijuana, Vicodin, and continued physical activities.  He diagnosed possible inflammatory ocular disease, possible spinal disease, and definite concomitant secondary fibromyalgia.

At her sleep study in late October 2012, Bell reported insomnia, described a challenging childhood, and reported arthritis in her back and knees.  She said she spent her days running around after toddlers.  She rarely had the chance to nap.  Upon examination, Bell displayed no muscle tenderness, the muscle bulk, tone and power were normal, and her gait and station were normal.  Due to her anxiety, she fought sleep.

Four days later, Bell reported to immediate care complaining of an excruciating bout of back pain, requiring the help of her husband to move.  On examination, her neck had normal ROM.  Her greatest point of tenderness was at the left SI joint.  She was given an injection of Toradol, which allowed her to sit up and walk slowly.  Bell returned to Dr. Li a few days later,

reporting her pain was not well controlled and was worse at her low back and neck.  Dr. Li increased Bell's Norco prescription and discussed a long-acting narcotic.  Bell returned to Dr. Barkhuizen, who examined Bell and noted full ROM in upper and lower extremity joints, but multiple fibromyalgia tender points.  He recommended she stop drinking all alcohol and discuss Methotrexate in the future; he agreed with increasing the strength of her narcotic and recommended a referral to a pain clinic for a long-acting analgesic.

When Bell returned to the sleep clinic in late November 2012, Bell learned she did not have sleep apnea, but that she had severe insomnia as a result of abandonment issues as a child.

Bell met with Graham in early December 2012; Bell reported improved sleep, but reoccurring OCD symptoms.  She was consistently late for her appointments and described feeling overwhelmed.  Buspar was helping with anxiety.  Bell processed her sleep and childhood issues at the next appointment.

Bell presented to Dr. Barkuizen with "multiple somatic complaints."  Tr. 368.  The doctor reassured Bell that her pain was due to her fibromyalgia.  Bell met with Bjornson and described financial stress and panic attacks; Bjornson prescribed Trazodone for sleep and Adderall for focus.  Bjornson described Bell as anxious, with inappropriate smiling.

In January 2013, Bell reported lack of motivation over the holidays, with increased pain and decreased sleep, but she felt more productive that week.  She felt her sleep improved on Trazadone.  Graham encouraged Bell to ask for a referral to a pain management clinic.  Dr. Li examined Bell in mid-January, noting mild tenderness in her cervical and lumbar spine, with close to normal ROM.  Dr. Li discussed a long-acting narcotic for pain control, but deferred to rheumatology.

Page 9 - OPINION AND ORDER

Bell's therapy appointments with Graham and Bjornson in January focused on the efficacy of the Adderall, which Bell said helped her focus. Bjornson noted that Bell had been on time that day, but that she was inappropriately smiling with an intense gaze, and mentioned psychic powers at the end of her appointment. Bjornson contacted Graham about her concern Bell was malingering and pushing for Adderall. When Graham next saw Bell, she confronted Bell about her inconsistent statements–Bell reported using the tools, while at the same time saying she did not have time to practice the skills. Tr. 426.

Dr. Barkhuizen declined to complete disability paperwork for Bell at the end of January 2013. The doctor noted that Bell "continues to have widespread pain involving her spine and extremities especially the right shoulder. Her hands feels swollen to her although she is able to make a tight fist. She has decades of back pain and [says she] had no pain once in her life when she had an epidural for childbirth. She has had prior iritis but no evidence of objective inflammatory arthritis on several visits in my office. She also has had normal inflammatory markers and has a negative HLA-B27." Tr. 459. Dr. Barkhuizen noted she had full ROM of her shoulders, hips, knees and ankles, and of her spine. She was "able to sit in a chair crosslegged and bounce up from a seated position without any difficulty." Tr. 460. The doctor explained fibromyalgia was the main cause of her pain and urged Bell to work with her primary care physician to get a referral to a pain clinic. The next day, Bell returned to Dr. Li, who added Neurontin to Bell's list of prescriptions. He no longer recommended a long-acting narcotic.

Bell told Graham she felt misunderstood by her doctors, that her rheumatologist had yelled at her and had refused to complete disability paperwork or refer her to pain management. Bell thought she was progressing in therapy, but she appeared defensive. Bell told Bjornson in

February 2013 that her husband's health had worsened, that she was feeling responsible, but that she was motivated and timely for appointments. She described physical symptoms of anxiety.

Bell underwent a diagnostic interview and multiple therapy sessions with James Mours, PsyD, beginning in March 2013. She appeared attentive, logical, relevant, with a good attitude, but with an anxious mood. She described difficulty progressing with her previous therapist. Dr. Mours diagnosed Bell with generalized anxiety disorder, cannabis dependence, major depressive disorder, obsessive compulsive disorder, attention deficit/hyperactivity disorder, and panic disorder without agoraphobia. At almost all of her therapy appointments with Dr. Mours, Bell complained that her husband was not assisting her at home and that she handled the "majority of the finances, house work and care for her children[.]" *See* Tr. 420 (3/21/13), 416 (4/25/13), 414 (6/5/13), 412 (6/17/13), 410 (7/1/13–moving into rental, handle wage garnishment, deal with parents), 408 (8/8/13), 404 (10/16/13–wondering if husband should be looking for work), 399 (12/16/13–husband working from home, but she is performing the majority of the housework, care for children, finances and appointments), 397 (2/11/14–learn to be assertive), 611 (2/20/14), and 609 (4/25/14).

At her April 2013 appointment with Bjornson, Bell reported improved anxiety, but good days and bad days with her depression. She and her husband enjoyed a "great" vacation to Hawaii in May 2013. Tr. 414. Bell told Dr. Li in May 2013 that she was "not working currently and it is very difficult for her to keep her job even [if] she can find a job due to her medical psychological condition." Tr. 382. In June, Bell told Bjornson that she was exhausted because her toddler was not sleeping at night, and her husband was not helping with the children. Similarly, in August, Bell told Bjornson that the family was having financial problems, that her

husband was not helping, that the toddler was waking at night, that she was having pain, and that someone ran into her car.  Bjornson urged her to talk to her therapist and continued her on the current medications.  Bell was late to her October appointment with Bjornson, reporting that she had been very busy and had little help at home; her energy varied but she felt down.  Bell reported in November that she continued "to struggle with managing responsibilities as a wife and mother without help from husband."  Tr. 386.

Bell met with a pain specialist, Joseph Stapleton, M.D., in November 2013.  She reported average pain of 8/10.  She was exercising three to five times a week, walking and swimming.  Dr. Stapleton prescribed Lyrica.

Bell returned to Bjornson in December 2013 reporting very limited help at home and continued depressed mood.  Bjornson prescribed Abilify.  Bell felt better at her appointment with Bjornson in January 2014, but stopped taking Abilify due to side effects.

Bell sought care from a gastroenterologist in March 2014 for vomiting, nausea, and abdominal pain.  She denied marijuana use and reported walking on a daily basis.  An ultrasound of her gall bladder was negative; she was instructed on the use of Miralax.  She sought urgent care for her shoulder about a week later and was given Percocet, but flagged for no further narcotics for that kind of pain.

In May 2014, Bell told Dr. Mours that she had an opportunity to act as an "extra" in a television show one day and really enjoyed it, although she stated she was "sore for four days afterwards."  Tr. 605.  She said it was the first time she felt happy in a long time.  Dr. Mours completed a mental residual functional capacity assessment for Bell.  Tr. 542.

Dr. Li assessed Bell's shoulder sprain in May 2014. and directed her to avoid heavy lifting and use ibuprofen.  Four days later, Bell went to the emergency department complaining of a back sprain.  She reported reaching down to pick her phone up off the ground and felt a sudden strain in her back.  Upon examination, she had low back tenderness, with slow extremity movement, but intact strength in her legs.  She was given a prescription for Percocet.

In June 2014, Bell was late for her appointment with Dr. Mours.  It was only the third time in 18 appointments when she had been late.  She reported that her husband had been unfaithful; her children were staying with a friend.  She held a garage sale to raise money for her mortgage.  She appeared calm at her July 2014 session, although her mood could have been the result of fatigue.  Bell reflected on past partners and the possibility of divorce.  She reported that despite the turmoil, she had been called to be an extra on a television show for a day.

## DISCUSSION

Bell challenges the ALJ's credibility assessment, his treatment of Bell's medical providers' opinions, his listing analysis, and his rejection of the lay witness statements.

I.    <u>Credibility</u>

Bell testified that she has four children, two of whom lived with her and her husband half time.  The two others–a two-year old and a four-year old–either stayed home with her or went to a friend's house, and her four-year old went to preschool two days a week.  Her husband was home with her during the day.  Bell testified that she stopped working because she was terminated, and because she could no longer perform the work.  She accepted unemployment benefits.  She felt she could not work because she was in pain while sitting–and could not bend to get up and down from a chair–and her anxiety caused concentration problems.  She testified

that her mother or a friend would sometimes help with her children. She and her husband split

the childcare duties and she testified that he worked from home–when he was employed–and

could set his own hours so he could help her. She spent her mornings in the bathroom, then

straightened up the house a little bit, and went to doctor appointments. A mix of people would

make sure the children were fed, including her husband, friends, family, and the older daughters,

or they fed themselves from a snack drawer in the kitchen. She could walk a block to the

mailbox down the street and back, which she did twice a week. She had not taken any vacations

the past four years.

The ALJ found Bell not credible for several reasons: the objective medical evidence did

not support the level of physical or mental infirmity Bell described, she made inconsistent

statements about her level of activity, and her mental health impairments appeared connected to

situational stressors. Finally, the ALJ thought it noteworthy that Bell collected unemployment

benefits, which required that she hold herself out as available to work.

When deciding whether to accept the subjective symptom testimony of a claimant, the

ALJ must perform a two-stage analysis. In the first stage, the claimant must produce objective

medical evidence of one or more impairments which could reasonably be expected to produce

some degree of symptom. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). The

claimant is not required to show that the impairment could reasonably be expected to cause the

severity of the symptom, but only to show that it could reasonably have caused some degree of

the symptom. In the second stage of the analysis, the ALJ must assess the credibility of the

claimant's testimony regarding the severity of the symptoms. *Id.* The ALJ "must specifically

identify the testimony she or he finds not to be credible and must explain what evidence

undermines the testimony." *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001). General findings are insufficient to support an adverse credibility determination and the ALJ must rely on substantial evidence. *Id.* "[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

Although the ALJ cannot reject subjective pain testimony solely because it was not fully corroborated by objective medical evidence, medical evidence is still a relevant factor in determining the severity of the pain and its disabling effects. *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001). The ALJ pointed out that Bell's testimony that she could not lift five pounds and that her husband and friends had to help her was inconsistent with physical examinations demonstrating normal muscle strength, tone and coordination. She also had full ROM in her spine, knees and ankles and Dr. Barkhuizen noted Bell was "able to sit in a chair crosslegged and bounce up from a seated position without any difficulty." Tr. 460. Dr. Barkhuizen's observation is consistent with other evidence in the record; at every appointment with Dr. Mours, he observed normal gait and unremarkable motor activity. As for her mental limitations, Bell's mental status was normal throughout her treatment, and she appeared cooperative and attentive. Bell identifies a handful of exceptions, but the vast majority of Bell's treatment notes contradict her reports of memory and concentration difficulties.

Additionally, inconsistent statements or less than candid testimony is a clear and convincing reason for questioning a claimant's testimony. *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008); *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (daily activities that are

inconsistent with testimony purporting to be limited is a clear and convincing reasons). The ALJ identified repeated instances in the medical record where Bell complained that her husband was not helping at home, and that she was attending to all of the household chores and childcare. Bell dismisses this reason, suggesting that she was only occasionally unhappy with her husband's unwillingness to help, but the medical record indicates otherwise. At almost every appointment during the year she met with Dr. Mours, and at many of her sessions with Bjornson, Bell complained about the lack of help from her husband and the responsibility she felt to care for the house and children. Such evidence directly contradicts Bell's testimony that she was unable to care for the house and children and that she required her husband's help to function. Other inconsistent statements include her testimony that she never went on vacation, when the family went to Hawaii for two weeks, and she told one of her providers that she runs after toddlers all day. The ALJ's clear and convincing reasons are supported by substantial evidence in the record.

Similarly, the ALJ's conclusion that situational stressors caused Bell's mental distress is rational. Bell repeatedly described her stressors as her husband's diagnosis, her young children, and financial issues, and she spent the bulk of her appointments with Dr. Mours discussing the division of labor between herself and her husband, as well as her husband's infidelity.

With respect to unemployment benefits, because it is not clear whether Bell held herself out for full or part-time work, her receipt of unemployment benefits cannot be a credibility factor. *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008). Nevertheless, the fact that the ALJ improperly considered some reasons for finding plaintiff's credibility undermined does not mean that the ALJ's entire credibility assessment is improper. *Batson v.*

*Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004).  Reviewing the totality of the evidence, the ALJ did not err in his assessment of Bell's testimony.

II.     Medical Evidence

Bell challenges the ALJ's rejection of Dr. Mours' and Dr. Li's opinions.  The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician.  More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual.  *Orn*, 495 F.3d at 632.  If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons. *Id.* (treating physician); *Widmark v. Barnhart*, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician).  Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. *Orn*, 495 F.3d at 632; *Widmark*, 454 F.3d at 1066.  The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician.  *Widmark*, 454 F.3d at 1066 n.2.  Since both treating doctors gave opinions that were inconsistent with other physicians' opinions, the ALJ was required to provide specific and legitimate reasons to give the treating physicians' opinions less weight.

A.     Dr. Mours

On May 5, 2014, Dr. Mours completed a check-the-box form identifying generalized anxiety disorder as Bell's only diagnosis.  He noted the following symptoms:  appetite disturbance with weight change, decreased energy, generalized persistent anxiety, difficulty thinking or concentrating, psychomotor agitation or retardation, apprehensive expectation,

emotional withdrawal or isolation, easy distractability, and sleep disturbance.  Dr. Mours also described periodic depression, hopelessness, obsessive thoughts, and noted that "constant life stressors make progress in therapy difficult."  Tr. 544.  He thought Bell had a "poor" ability to work full-time at a normal work pace, and noted that Bell's experience of pain was affected by her anxiety, fatigue and depressed mood.  The doctor believed Bell would miss more than four days a month of work.  The doctor identified moderate restrictions in activities of daily living, marked difficulties maintaining social functioning, constant deficiencies in concentration, and repeated episodes of deterioration.

The ALJ concluded Dr. Mours' opinion was inconsistent with his treatment notes.  For example, Dr. Mours neglected to account for the fact that Bell was taking care of all the household tasks as well as the four children.  She also consistently appeared appropriately groomed, with good eye contact, normal speech, appropriate affect, and average short and long-term memory.  Additionally, the form Dr. Mours completed was a check-the-box form and the doctor did not explain his selections.  For instance, he did not explain why he thought Bell would miss four days a month of work; treating records and activities of daily living did not support such a finding.

The ALJ gave specific and legitimate reasons to disregard Dr. Mours' opinion.  As the ALJ noted, there is no evidentiary support (or explanation) for Dr. Mours' conclusion that Bell would miss work more than four times a month.  The treating record reflects Bell never missed her appointments (and she was late for only three of the eighteen).  While other providers apparently had difficulty with Bell appearing on time for her appointments, that was not the case for Dr. Mours.  Further, the extent of the limitations he identified (including work at a reduced

pace, marked limitations in ability to get along with co-workers or peers or deal with normal work stress) was inconsistent with Bell's reports that she was handling all of the responsibilities at home, including caring for four children and dealing with the finances. In sum, an ALJ is not required to accept the opinion of a physician, even a treating physician, if the opinion is "conclusory, brief, and unsupported by the record as a whole[.]" *Batson*, 359 F.3d at 1195; *see also Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) (permissible to reject check-off reports from physicians that do not contain any explanation of the bases for the conclusions). The ALJ did not err.

      B.    <u>Dr. Li</u>

Prior to her alleged disability onset date, Dr. Li opined that Bell would have limitations as a result of AS, insomnia, and depression. The ALJ gave the opinion no weight because it was completed outside the relevant time frame. Dr. Li later instructed Bell to "avoid heavy lifting," but the ALJ gave this instruction no weight as it was vague, did not provide functional limitations, and contained no time frame.

With respect to the first opinion–given in February 2009–Dr. Li simply suggested Bell could work eight hours a day, but later hours. Further, the opinion arose prior to the onset date of disability. *Carmickle*, 533 F.3d at 1165 (medical opinions prior to the relevant period are of limited persuasiveness). Bell points out that in the context of degenerative conditions, medical records prior to the relevant period can be helpful, but there is no evidence any of her severe impairments *are* degenerative. As the Commissioner points out, the ALJ concluded AS was not a severe impairment and Bell does not challenge that finding.

Page 19 - OPINION AND ORDER

Similarly, Dr. Li's instruction to Bell to avoid heavy lifting was a vague instruction and without any relevant duration; in any event, the ALJ crafted an RFC limiting Bell to light-level lifting.  The ALJ gave specific and legitimate reasons to disregard Dr. Li's opinions.

III.    Lay Witness

Bell challenges the ALJ's rejection of her husband's and her friend's reports about Bell's functioning.  Lay testimony about a claimant's symptoms is competent evidence which the ALJ must take into account unless he gives reasons for the rejection that are germane to each witness. *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2006).

Bell's husband wrote that Bell could not do much around the house, that she rarely prepared meals, that she could only lift five pounds, and walk for ten minutes, that her pain and depression made concentration difficult, and that he had to help her with most if not all activities. The ALJ noted that Mr. Bell's report was inconsistent with the medical evidence, documenting that Bell repeatedly reported her husband did nothing around the house and that it was Bell who cared for the house, children, and finances.  The ALJ gave a germane reason to reject Mr. Bell's report.

Bell's former co-worker/friend, Brandi Browning, wrote Bell required accommodations at work (such as dim lighting and cushions) and that Browning went to Bell's home a few days a week and found that Bell had good days–when she was up, showered, dressed, and caring for the children–and bad days when she had not showered, the drapes were closed, and the kids were entertaining themselves.  The ALJ found Browning relied on Bell's less than credible complaints.

I agree with Bell that Browning's observations are independent of anything Bell may have told her.  Nevertheless, as the Commissioner points out, Browning's report is essentially the

same as Bell's testimony.  It is acceptable to reject testimony for the same reasons given for the

claimant if the testimony is similar to the claimant's complaints.  *Valentine v. Comm'r of Soc.*

*Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009) (acceptable to reject spouse's testimony for same

reasons given for claimant if spouse's testimony was similar to claimant's complaints).

Additionally, there is no indication what functional limitations the ALJ should have

implemented given Browning's statement.  The ALJ accepted that depression was a severe

impairment and included functional limitations in the RFC.  The RFC accounts for all the

limitations that are supported by substantial evidence.  *Molina*, 674 F.3d at 1122 (error may be

harmless where failure to provide germane reasons for rejecting lay testimony did not alter the

nondisability determination).

IV.    Listing

Bell argues the ALJ erred in applying the listing criteria for fibromyalgia, as well as

anxiety and/or affective disorder.

The listings set out at 20 CFR pt. 404, Subpart. P, App. 1 are "descriptions of various

physical and mental illnesses and abnormalities, most of which are categorized by the body

system they affect."  *Sullivan v. Zebley*, 493 U.S. 521, 529-30 (1990).  For a claimant to show

that her impairment matches one of those listed, the impairment must meet all of the specified

medical criteria.  *Id.* at 530.  Alternatively, a claimant may show that her unlisted impairment is

"equivalent" to a listed impairment, but to do so she must present medical findings equal in

severity to all the criteria for the one most similar listed impairment.  *Id.* at 531.  Equivalence is

determined on the basis of a comparison between the "symptoms, signs and laboratory findings"

about the claimant's impairment, as evidenced by the medical records, "with the medical criteria

shown with the listed impairment." 20 C.F.R. § 404.1526. "Medical equivalence must be based

on medical findings." 20 C.F.R. § 404.1526. "A generalized assertion of functional problems is

not enough to establish disability at step three." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir.

1999). If a claimant's impairment meets or is equivalent to a listed impairment, she is presumed

unable to work and is awarded benefits without a determination whether she can actually perform

prior work or other work. *Sullivan*, 493 U.S. at 532. Bell bears the burden of proving that she

has an impairment that meets or equals the criteria of an impairment listed in Appendix 1 of the

Commissioner's regulations. *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005).

Fibromyalgia is not a listed impairment, but the ALJ must "determine whether [it]

medically equals a listing (for example, listing 14.09D in the listing for inflammatory arthritis),

or whether it medically equals a listing in combination with at least one other medically

determinable impairment." SSR 12-2p, *available at* 2012 WL 3104869.

The ALJ determined Bell's fibromyalgia did not meet listing level severity. He thought

that she "function[ed] quite well." Tr. 24. She reported exercising three to five time per week by

walking and swimming in November 2013. Earlier that year she had been able to travel to

Hawaii, manage a house move, complete bankruptcy paperwork, clean the house and care for

four children.

Bell suggests the ALJ relied on isolated instances, and disputes that exercising two to

three times per week (reportedly resulting in pain at 9/10) is evidence of doing well. Regardless

of the number of times she exercised, and the amount of pain she felt as a result, Bell's repeated

reports to Dr. Mours throughout the year he treated her support the ALJ's conclusion that she

was able to function quite well. Although she would have preferred to share the burden with her

Page 22 - OPINION AND ORDER

husband, the evidence reflects that she was able to take care of the majority of the finances, housework and their small children.  The ALJ also noted that she started a stay-at-home business with her husband.

Bell also relies on her reports of sleep disturbances, suicidal ideation, concentration problems, and loss of interest in hobbies, which she argues satisfy the paragraph A elements of Listing 12.04.  The ALJ did not address these paragraph A criteria.

Regardless, Bell bears the burden of satisfying the paragraph B criteria, requiring a "marked" limitation in two of the following:  daily living; social functioning; concentration, persistence, or pace; or repeated episodes of decompensation.  Bell disputes the ALJ's conclusions that Bell did not display marked difficulties in concentration and marked difficulties in her activities of daily living, but the ALJ's interpretation of the record is just as rational.  Bell relies on evidence that the ALJ properly rejected, like Browning's letter and her own testimony.  While Bell refers to her employment termination as indicative of marked difficulties in concentration, the ALJ properly concluded Bell was unable to perform her past work and included appropriate limitations in the RFC limiting Bell to unskilled and routine work.  The ALJ properly pointed to Bell's ability to handle her family's finances and legal documents, and her presentation to providers as pleasant, cooperative, with appropriate grooming and hygiene, in concluding that Bell demonstrated mild limitations in activities of daily living and moderate difficulties in concentration, persistence, or pace.  The ALJ did not err.

///

///

///

**CONCLUSION**

The findings of the Commissioner are based upon substantial evidence in the record and the correct legal standards. For these reasons, the court affirms the decision of the Commissioner.

IT IS SO ORDERED.

DATED this _____1st_____ day of December, 2016.


    _/s/ Garr M. King_____
    Garr M. King
    United States District Judge